# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

IN RE                                    )
                                         )        **Case No. 07-20389-TLM**
**DAVID BRUCE ALLEN and,**               )
**INGRID ZIEMELIS ALLEN,**               )        **Chapter 13**
                                         )
                    Debtors.             )
_____          )

## MEMORANDUM OF DECISION ON
## MOTION FOR RECUSAL
_____

The chapter 13 debtors, David and Ingrid Allen ("Debtors") have filed a

"Motion for Disqualification" of the below-signed Judge.  *See* Doc. No. 107 (the

"Motion").  Upon the record and submissions, and after hearing, the Court finds

and concludes that the Motion is not well taken and the same will be denied.[1]  This

Memorandum constitutes the Court's findings and conclusions on the matter.  Fed.

R. Bankr. P. 7052, 9014.  A separate Order will be entered.  Fed. R. Bankr. P.

9021.

_____

[1]  Debtors filed a duplicate motion to disqualify in Adv. No. 08-07014-TLM (*Allen v. Western Sierra Bank, et al*) (the "Western Sierra" or "WSB" adversary proceeding).  *See id.* at Adv. Doc. No. 23.  In a second adversary proceeding (Adv. No. 09-07013-TLM (*Allen v. SunTrust Mortgage, et al*) (the "SunTrust adversary proceeding"), the Debtors did not file an identical motion, but they did file an "Affidavit of Adjudicative Facts of David B. Allen in Support of Motion for Disqualification/Recusal . . . ."  *See id.* at Adv. Doc. No. 15.  In this affidavit, Debtors argue for recusal on many of the same (or similar) grounds set forth in the motions for disqualification filed in the main case and in the Western Sierra adversary case.  The Court has therefore entered Memorandum Decisions on the Motion for Recusal in this chapter 13 case and in both adversary proceedings.

MEMORANDUM OF DECISION - 1

**BACKGROUND AND FACTS**

To fully address Debtors' arguments related to this Motion, it is necessary to review in detail Debtors' chapter 13 bankruptcy case and the subsequent adversary litigation.[2]

**A.      The chapter 13 case**

Debtors commenced their chapter 13 on August 29, 2007 through the filing of a voluntary joint petition.  Doc. No. 1.  They were represented by attorney Savi Grewal.

**1.      Debtors schedule the Trapper Creek and Shingle Mill Road properties as encumbered assets**

Debtors' schedules asserted their ownership of certain real estate, as community property and in fee simple.  One parcel was the "Trapper Creek" property in Sandpoint, Idaho.  Debtors claimed the then-current value of the Trapper Creek property was $449,256.  They indicated that there were secured claims against it totaling $191,272.  *Id.* at sched. A.  This yielded, mathematically, equity of $257,984.

Debtors also listed as community real property held in fee simple a parcel characterized as a "residence" located at 1596 Shingle Mill Road in Sandpoint.

---

[2]  These findings are therefore rather extensive.  For that reason, and since several other matters are pending before the Court for decision, these factual findings will be incorporated by reference in other memoranda of decision in this chapter 13 case and in the two adversary proceedings mentioned in note 1, *supra*.

MEMORANDUM OF DECISION - 2

They asserted the then-current value of this property was $386,932 and indicated

there were claims secured against that residence totaling $257,957.  *Id.*  The

difference or "equity" was $128,975 and Debtors claimed $100,000 of that equity

as exempt under Idaho Code § 55-01003.  *Id.* at sched. C.

Together, the $28,975 non-exempt equity in the Shingle Mill residence and

the $257,984 equity in the Trapper Creek property totaled $286,959.  Debtors

listed a total of $17,462 in unsecured debt.  *Id.* at sched. F.[3]  Their chapter 13 plan

would therefore have to provide for full payment of all creditors in order to be

confirmed.  *See* § 1325(a)(4).[4]  However, a chapter 13 plan might allow Debtors to

control the process of liquidating or otherwise realizing the equity from their real

properties, rather than turning over the assets to a chapter 7 trustee for liquidation.[5]

Debtors' schedules clarified the nature of the secured claims against the

two properties.  As to the property valued at $449,256 (Trapper Creek), Debtors

showed Jeffrey and Mary Eich as holding a $91,272 claim based on a July, 2005

"equity line of credit" from Mountain West Bank.  Debtors listed attorney

Catherine Dullea as a party to be notified on behalf of the Eichs.  Doc. No. 1 at

---

[3]  There was an additional $3,149 in unsecured deficiency claims shown on schedule D.

[4]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[5]  Debtors' schedules and statements indicated that David Allen was a real estate agent. Doc. No. 1 at sched. I; *see also* Doc. No. 1 at statement of financial affairs (SOFA) at 1 (reflecting real estate commission income from 2005 through 2007).

MEMORANDUM OF DECISION - 3

sched. D.  Debtors also disclosed that they had taken "money borrowed against equity" of $100,000 on this same property, which debt was owed to Panhandle Escrow Company.  Ms. Dullea was listed as counsel for notification as to both Panhandle Escrow and another party, "UMPQUA Bank."  *Id.*

In connection with the residence on Shingle Mill Road, valued at $386,932, Debtors disclosed a first deed of trust securing $212,367 to SunTrust Mortgage, Inc. and a $45,590 equity line of credit to SunTrust Bank.  The Just Law Office in Idaho Falls was listed as counsel for notification on behalf of such creditors.

None of these secured claims was listed as disputed or contingent or unliquidated.  *Id.*  All schedules and statements were signed under penalty of perjury by Debtors, who affirmed that the same were true and correct to the best of their knowledge, information and belief.

## 2.    The confirmed chapter 13 plan contemplates sale of the Trapper Creek property by September 2008

Debtors had, initially, proposed to fund their chapter 13 plan not through regular monthly payments but instead with annual payments, announcing that they intended to sell the Trapper Creek property to fund 100% payment to creditors. *See* Doc. Nos. 5 (Plan, filed Aug. 29, 2007), 33 (First Amended Plan, filed Nov. 14, 2007).  The First Amended Plan added a provision to the effect that a failure to sell the Trapper Creek property before December 5, 2008 would entitle the creditors secured on that property and the creditors secured on the residence

MEMORANDUM OF DECISION - 4

property on Shingle Mill Road to obtain an order terminating the § 362(a) stay.
Doc. No. 33 at ¶ 1.1.

In light of objections that had been filed and in order to deal with certain
Code requirements, a Second Amended Plan was signed by Debtors and filed in
March, 2008. Doc. No. 46. It continued the general approach discussed in the
First Amended Plan and also added proposed monthly payments in varying
amounts in lieu of the prior annual payments.

SunTrust Mortgage objected to confirmation in April, 2008. Doc. No. 49.
Negotiations ensued and, on June 17, 2008, some ten months after filing, an order
– endorsed by Debtors personally, their attorney, and counsel for SunTrust
Mortgage, Inc. – was entered confirming the Second Amended Plan. *See* Doc.
No. 59 ("Confirmation Order"). This order followed and confirmed the terms of
that plan, Doc. No. 46, with additional amendment in the text of the order as
follows:

  (a)    the order indicated that monthly "adequate protection" payments
         would be made to SunTrust Mortgage;

  (b)    the order shortened the plan's December 8, 2008, deadline to sell
         real property by roughly two months, making the new deadline
         September 30, 2008; and,

  (c)    the order reaffirmed the plan provision that any of the creditors
         secured by either the Shingle Mill Road or Trapper Creek properties
         could get stay relief without hearing in the event there was either no
         sale by the September deadline or other default by Debtors, such
         relief requiring only that such creditors file an affidavit of default

MEMORANDUM OF DECISION - 5

and present a proposed *ex parte* order.

Doc. No. 59, at 2-3.

The confirmed Second Amended Plan therefore acknowledged the existence of, and provided treatment for, the secured claims of the Eichs, Panhandle Escrow, SunTrust Mortgage, and SunTrust Bank.  *See*, *e.g.*, Doc. No. 46 at ¶ 1.1 and ¶ 5.2[6] and Doc. No. 59 at 2-3.[7]

> **3.    After Debtors were unable to sell the Trapper Creek property, the Court lifted the automatic stay as to the Trapper Creek and Shingle Mill Road properties**

Following confirmation, Debtors failed to sell the Trapper Creek property by the September 30, 2008 deadline.  On October 2, affidavits of default were filed by SunTrust Mortgage, Inc. (Doc. No. 62), through its attorney, Steven Boyce of Just Law Office, and jointly by Western Sierra Bank (custodian FBO Marita Stewart) and the Eichs (Doc. No. 63), and by the Eichs (Doc. No. 64), through their attorney, Ms. Dullea.  Orders of stay relief were entered October 5, 2008.  *See* Doc. Nos. 65-67.

---

[6]  The treatment at ¶ 5.2 provided, *inter alia*, that each such creditor "shall retain its lien on the collateral securing the claim until the allowed secured claim is paid in full."

[7]  In addition, by the time of confirmation in June, 2008, proofs of claim had been filed by the real estate secured creditors.  *See* Claim No. 2 (filed by SunTrust Bank, for $45,510); Claim No. 4 (filed by SunTrust Mortgage, for $230,602); Claim No. 5 (filed by the Eichs and Western Sierra Bank, custodian FBO [for benefit of] Marita Stewart, for $119,223); and Claim No. 6 (filed by the Eichs, as assignee of the secured claim of Mountain West Bank, for $86,584). The SunTrust Mortgage claim was later disallowed, in part, reducing the "arrearage" portion of the claim from $18,235 to $16,874.  *See* Doc. No. 53.  This was the only objection raised to any of the claims until Debtors' *pro se* objections filed the end of December, 2008, as discussed below.

MEMORANDUM OF DECISION - 6

After the Court lifted the stay, Ms. Dullea's clients scheduled a November 24, 2008 sale of the Trapper Creek property.  On November 18, 2008, however, the parties stipulated to postpone the sale until December 24, 2008.  *See* Doc. No. 77 (stipulation).  The stipulation was signed by Ms. Dullea and by Ms. Grewal who, at that time, was counsel of record for Debtors.  Debtors gained the benefit of the extension of the sale date.

### 4.    The Trustee moves to dismiss the chapter 13 case; Ms. Grewal withdraws as Debtors' counsel

Meanwhile, in September 2008, the chapter 13 trustee, C. Barry Zimmerman ("Trustee"), filed a motion to dismiss the Allens' bankruptcy case under § 1307(c).  Doc. No. 61.  On October 14, 2008, Debtors – contending a rift had occurred with their attorney – filed a *pro se* response to Trustee's motion.  Doc. No. 71.  In this pleading, Debtors asserted that "the creditors alleging to hold a secured interest" in the two real properties (the Trapper Creek property and the Shingle Mill Road residence) had failed to file affidavits (of default) as required by the Confirmation Order.  Debtors also asserted that they should not be blamed for the fact that "the Mortgage banking industry went belly up and caused the demise of the real estate markets," frustrating their plans to sell the Trapper Creek property and perform the confirmed plan.

Trustee's motion to dismiss was discussed at a hearing on November 4 at which Ms. Grewal and Debtor, David Allen, both appeared and made

MEMORANDUM OF DECISION - 7

representations to the Court.  The hearing on the motion was continued to

November 24.  At that hearing, the Court authorized the withdrawal of Ms.

Grewal as counsel for Debtors and continued the dismissal hearing to January 13,

2009.

### B. Debtors' adversary complaint regarding the Trapper Creek property

Also on November 24, 2008 (the same day their counsel was allowed to

withdraw), the Debtors filed a *pro se* adversary proceeding against Western Sierra

Bank, Umpqua Bank, the Eichs, Mountain West Bank, and Sandpoint Title

Company.  Adv. No. 08-07014-TLM.  It was styled as a "Petition for Injunction

Complaint."  *Id.* at Adv. Doc. No. 1.[8]

In their complaint, Debtors indicated their intention to "recover certain

property belonging to the plaintiffs consisting of two promissory notes concerning

the property of Trapper Creek . . . ."  *Id.* at 2.  Debtors' theories were outlined in

"affidavits" of Mr. Allen.  *See* WSB Adv. Doc. Nos. 2, 4.  They are also alluded to

in documents served on Ms. Dullea or her clients, which she attached to her

answer.  *See* WSB Adv. Doc. No. 6 at Exs. G-N.

Simplified here, Debtors' contentions are that the debtor-creditor

relationship was and is the reverse of what had been recognized in the bankruptcy

case and confirmed plan.  Debtors argue that the promissory note they gave, for

---

[8] Hereafter the adversary filings are cited as "WSB Adv. Doc. No. __."

MEMORANDUM OF DECISION - 8

example, to Mountain West Bank had to be and was booked as an asset by that Bank, thus meaning that Debtors had given money or value to the Bank, and either owed nothing to the Bank or that the Bank had to show an offsetting liability owed by the Bank to Debtors.  By this logic, Debtors claimed they were the "creditors" and Ms. Dullea's clients the "borrowers."  So, Debtors' argument goes, there is no obligation owed by Debtors to the Eichs or Ms. Dullea's other clients.  All such arguments are based on Debtors' *pro se* interpretation of Generally Accepted Accounting Principles (GAAP), the Uniform Commercial Code, sundry other provisions of the Idaho Code, and other materials.  The complaint's reference to injunctive relief was designed to stop any foreclosure sale, and subsequent conveyance after such sale to a bona fide purchaser, given the intended litigation over the alleged absence of any liability of Debtors' on the notes secured by the deeds of trust.

Ms. Dullea filed an answer to the complaint on December 12.  WSB Adv. Doc. No. 6.  She noted in that answer that she represented Marita Ramsey (formerly known as Marita Stewart) and explained that Ms. Ramsey's interests as a secured creditor in the Trapper Creek property were investments in her individual retirement account (IRA) and that the named bank defendants (Western Sierra and Umpqua) were simply the places where Ms. Ramsey's IRA was held. Ms. Dullea also represented the Eichs, who had a partial interest in the same deed

MEMORANDUM OF DECISION - 9

of trust that secured Ms. Ramsey, and who also held a separate deed of trust as

assignee of Mountain West Bank.  WSB Adv. Doc. No. 6.  This answer

specifically noted that the deed of trust foreclosure sale under the Ramsey/Eich

deed of trust was scheduled for December 24, 2008 by virtue of the prior

stipulation.  *Id.* at 4, 5.  The answer was served by mail on Debtors.  *Id.* at 10.[9]

### C.    Debtors' December 23 pleadings regarding the Trapper Creek property, including a request to enjoin the December 24 sale

Approximately midday on December 23 – the day prior to the rescheduled

deed of trust sale – Debtors filed a "Motion to Strike and Declaratory Judgment;

and Motion to Shorten Time; and Notice of Hearing; and Certificate of Service."

WSB Adv. Doc. No. 11 (the "Motion to Strike").  Through this pleading, Debtors

sought to strike the answer, as well as numerous other documents filed in the

chapter 13 case.  They also asked for an order "rescinding all orders made by the

Court in the . . . bankruptcy and to Declare that the Stay . . . be in place against the

defendants."  As to Ms. Dullea, Debtors demanded a jury trial "on the merits of

the issues of declaratory judgment pertaining to [Ms. Dullea's] . . . alleged

representation or lack thereof . . . ."  They asked for a declaratory judgment

against Ms. Dullea regarding an alleged violation of Idaho Code § 3-301(3),

---

[9]  Thus, even if Ms. Grewal had not provided Debtors a copy of the November 18 stipulation, Doc. No. 77 – the record not being clear as to whether that did or did not occur – Debtors were advised by this Answer that the sale was scheduled for December 24.  As discussed below, Debtors waited until the eve of foreclosure to attempt to stop that sale.

MEMORANDUM OF DECISION - 10

evidently based on an alleged lack of written contract between Ms. Dullea and her client(s). Debtors also wanted an award of costs. *Id.*[10]

In the midst of this pleading is a request that an "Order for Temporary Injunction be granted until this and other Motions can be heard fully and determined by the Court." *Id.* at 2.

It did not appear from the submissions that any advance notice had been given to Ms. Dullea of the injunction request, and the Motion to Strike would not have provided timely notice.[11] There were no allegations in the Motion to Strike about any oral or written notice, nor other allegations compliant with Fed. R. Civ. P. 65(b)(1), incorporated by Fed. R. Bankr. P. 7065.

Rather than denying the request for injunctive relief for failure to comply with rule requirements, the Court contacted Ms. Dullea by telephone on December 23. The sole participants on this call were the below-signed Judge and Ms. Dullea. The discussion consisted of the following.

The Court advised Ms. Dullea that a pleading (the Motion to Strike) had been filed on that day in Adv. No. 08-07014-TLM, and that the Court determined it requested injunctive relief. The Court stated that it appeared the injunctive relief

---

[10] In a supporting memorandum, Debtors make additional arguments as to Ms. Dullea's conduct, and also raise issues as to their own (former) counsel, Ms. Grewal. *See* WSB Adv. Doc. No. 12.

[11] The certificate of service on the Motion to Strike indicated service was made on the defendants by Debtors on December 23, 2008, but did not indicate the manner of service.

MEMORANDUM OF DECISION - 11

might involve a foreclosure sale and asked Ms. Dullea if one was still pending on

December 24 as had been indicated in her adversary answer and in the November,

2008, stipulation in the chapter 13 case.  She responded that the sale was still

scheduled for Christmas Eve, December 24.  The Court suggested the injunctive

request could be set for an emergency telephone hearing later that day, December

23 or, alternatively, that a hearing could be set in January should the creditors

voluntarily postpone the sale under applicable Idaho law for one month.  Ms.

Dullea agreed to such a postponement until January 23, 2009, in order to eliminate

the need for a hearing that day.  The call concluded.  No other matter was

addressed.[12]

The Court then entered on the afternoon of December 23 an Order and

Notice of Hearing.  *See* WSB Adv. Doc. No. 13.  It stated, *inter alia*:

> To obviate the need to schedule and hold a hearing today, attorney
> Catherine Dullea, counsel for the Defendant creditors, agreed to
> postpone, under and pursuant to Idaho law, the December 24, 2008,
> scheduled trustee's sale of real property until January 23, 2009.

*Id.* at 2.  Based on the postponement, the request for injunctive relief was set for

hearing on January 13, 2009.  *Id.*  This order in the adversary proceeding also

stated that Debtors were to serve their December 23 pleadings and any other

pleadings or paper related thereto on Defendants' attorneys, and that such

---

[12] Ms. Dullea's affidavit regarding the Motion is consistent.  *See* WSB Adv. Doc. No. 24, attach. 1.

MEMORANDUM OF DECISION - 12

additional filings be made no later than the end of December.  Responsive

pleadings were due January 5.  *Id.* at 3.

### D.    Debtors' subsequent pleadings

Debtors filed no additional pleadings in Adv. No. 08-07014-TLM before

the end of the year.  However, on December 31, 2008, they filed the following

documents in the chapter 13 case:

–    Motion to Modify Chapter 13 Plan (Doc. No. 86);

–    Motion to Modify Chapter Bankruptcy (Doc. No. 87);

–    Notice of Constitutional Challenge (Doc. No. 88);

–    Notice of Hearing (Doc. No. 89);[13]

–    Objections to Claim Nos. 1 - 6 (Doc. Nos. 90 - 95).[14]

As explained below, Debtors intended for these matters to be decided at the

January 13, 2009 hearing on Debtor's request for injunctive relief, but these

matters were not properly noticed.

### E.    The January 13, 2009 hearing

### 1.    Debtors' claim objections (Doc. Nos. 90-95)

At the hearing on January 13, 2009, the Court determined that the

---

[13]  This Notice in the chapter 13 case referred to the "Motion to Strike" as well as to the motions to modify plan and to modify bankruptcy. *Id.*  The dockets reflect the Motion to Strike was filed only in the WSB adversary proceeding, and was not filed in the chapter 13 case file.

[14]  Each of the objections to claim contained a notice that the creditors had 30 days within which to respond and that, if they did so, a hearing would be set. *See id.*

MEMORANDUM OF DECISION - 13

objections to claims were not properly before the Court for resolution.  Not only

would a hearing that soon after the filing of the objection be inconsistent with the

30 day opportunity to respond set out in the objections themselves, *see* note 14

*supra*, the Rules required that the objection be served at least 30 days prior to

hearing, *see* Fed. R. Bankr. P. 3007(a).[15]  The Court indicated such objections to

claim would not be further addressed that day, but could be heard later on proper

notice and scheduling.

## 2.    Debtors' motions to modify (Doc. Nos. 86-87)

The Court next determined that the motion to modify the confirmed chapter

13 plan could not be heard because such a motion requires at least 20 days notice

under Fed. R. Bankr. P. 2002(a)(5).  The Court therefore also indicated it would

not be heard that day, but could be properly noticed for a hearing at a later date.

The motion to amend or modify the bankruptcy case was more difficult to

address, because it suggested relief not provided for under any cited provision of

the Bankruptcy Code.  Under that motion, Debtors appeared to want to set aside

the confirmation order and set aside the plan that was confirmed, and relitigate

numerous issues in the context of the chapter 13 case.  However, despite the

analytical difficulties, the Court concluded that inadequate notice had been given

---

[15]  For simplicity, the discussion here excludes the fact that all deadlines based on notices
served by mail have an additional three days added, pursuant to Fed. R. Bankr. P. 9006(f).  Only
the base deadlines are noted.

MEMORANDUM OF DECISION - 14

and that hearing was not yet appropriate.  It, too, would not be heard that day.

In regard to all these deferred matters, the Court did not render a substantive ruling, either granting or denying them.  The Court therefore entered no written orders on such matters.

### 3.    Debtors' constitutional challenge (Doc. No. 88)

The notice of Constitutional challenge filed by Debtors was determined to be inadequate under Fed. R. Bankr. P. 9005.1 (incorporating Fed. R. Civ. P. 5.1).  It was therefore denied, but without prejudice and subject to renewal.[16]

### 4.    Trustee's motion to dismiss (Doc. No. 61)

Trustee's motion to dismiss was taken under submission.  It was later reset for further hearing on February 10, 2009.

### 5.    Debtors' request for injunctive relief in the WSB adversary case

The Court considered the arguments and submissions of the parties on the temporary restraining order in WSB adversary proceeding, Adv. No. 08-07014-TLM.  The Court commenced that discussion by noting the background of the issue, including referencing the contact that had been made with Ms. Dullea as described above, which provided Debtors the interim restraint on foreclosure from December 23 to the date of hearing.

---

[16]  *See* Doc. No. 101 (minute entry, reflecting ruling).  No separate order was entered on this ruling.

MEMORANDUM OF DECISION - 15

Following the presentation of arguments on the issues of injunctive relief such matters were taken under advisement. The Court advised the parties that an oral ruling would be entered on January 16, 2009.

###    F.    The January 16 hearing and the Court's denial of Debtors' request for injunctive relief

On January 16, the Court entered oral findings and conclusions on the injunctive relief requested by Debtors, and denied that relief. That ruling addressed the standards applicable to such relief under Ninth Circuit law, principles of *res judicata* that attend confirmation of chapter 13 plans under § 1327 and related case law, and principles of judicial estoppel.

A separate written order was entered on January 16, 2009, denying Debtors' requested relief. *See* WSB Adv. Doc. No. 22.

###    G.    Post-ruling filings, including the motion for disqualification

On February 10, 2009, at the time set for the continued hearing on Trustee's motion to dismiss the chapter 13 case, Debtors appeared and announced that they had just filed, immediately prior to that hearing, a motion for disqualification. *See* Doc. Nos. 105 (minute entry), 107 (Motion); *see also* WSB Adv. Doc. No. 23 (duplicate motion). That obviously interrupted any further consideration of scheduled matters that day, and the Court announced that the motion to dismiss would be continued to March 18, 2009, and indicated that the same date could be used by Debtors for properly noticing up the motion for

MEMORANDUM OF DECISION - 16

disqualification.  *See* Doc. No. 105.  Other submissions on those matters could also be set on March 18.  *Id.*[17]

In the first two weeks of March 2009 (and notwithstanding an end-of-February deadline set by the Court at the February 10 hearing, *see* Doc. No. 105), Trustee and Debtors filed briefs related to the dismissal motion.  *See* Doc. Nos. 111, 112.  The Debtors also filed a statement of "adjudicative fact" in support of the motion for disqualification.  *See* Doc. No. 113.  In addition, an individual who had been assisting Debtors filed a declaration aimed at the disqualification issue.[18]  WSB Adv. Doc. No. 32.[19]

As to the other matters, on February 25, Debtors filed a "general notice" of hearing purporting to re-set for March 18 the motions to modify the plan and/or the case, and the objections to proof of claim that had been noticed for January 13 and deferred due to inadequate notice or other procedural problems.  *See* Doc. No. 109 (notice); Doc. No. 101 (Jan. 13, 2009 minute entry reflecting Court's deferral of various matters).

---

[17]  The minute entry, Doc. No. 105, contains a typographical error, referring to "February 18" rather than March 18.

[18]  This individual executes documents using the name "Steven David of aver."  *See*, *e.g.*, Doc. No. 108.  The Court will refer to him herein as Mr. David.

[19]  This document was filed in duplicate in the chapter 13 case and the WSB adversary proceeding, and it purports to reply to a pleading filed by Ms. Dullea on February 17 opposing the disqualification motion.

MEMORANDUM OF DECISION - 17

### H.      Appeal and related filings

In addition to such matters, there were also several filings in the WSB adversary action (No. 08-07014-TLM).  Following the entry of the order denying injunctive relief on January 16, 2009, WSB Adv. Doc. No. 16, Debtors filed a notice of appeal.  *See* WSB Adv. Doc. No. 25 (filed February 17, 2009).  They also filed a request for waiver of the filing fee for the appeal, WSB Adv. Doc. No. 27, and a request that the costs of preparation of transcript be waived, WSB Adv. Doc. No. 35.

### I.      The March 18 hearing

The motion for disqualification was heard, as scheduled, on March 18, 2009.  Debtors appeared, as did Ms. Dullea, Mr. Boyce for Sun Trust Mortgage, and another attorney, Michael Ramsden, for creditor e-CAST Settlement Corp., which had filed one of the proofs of claim objected to by Debtors.

Following argument and discussion, the motion for disqualification was taken under advisement.  In order to make the most productive use of the appearance of the several parties and the opportunity for hearing, the Court also heard submissions on the other pending matters, in the event the disqualification motion was denied and this Court could rule on such additional matters.

## DISCUSSION AND DISPOSITION

Recusal of a judge in bankruptcy proceedings is governed by 28 U.S.C. § 455, which provides, in relevant part:

MEMORANDUM OF DECISION - 18

> (a)     Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b)     He shall also disqualify himself in the following circumstances:
>
> > (1)     Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

28 U.S.C. § 455(a)(b)(1).

The standard for recusal under § 455 is an objective one, and asks "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988); *Hale v. United States Trustee (In re Basham)*, 208 B.R. 926, 933 (9th Cir. BAP 1997), *aff'd* 152 F.3d 924 (9th Cir. 1988). The reasonable person in this context means a well-informed, thoughtful observer, as opposed to a hypersensitive or unduly suspicious person. This objective standard also must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice. *United States v. Holland* , 519 F.3d 909, 913 (9th Cir. 2008).

In addition to this objective standard, judges must also be subjectively confident of their ability to be evenhanded. *Bernard v. Coyne (In re Bernard)*, 31 F.3d 842, 844 (9th Cir. 1994); *Holland*, 519 F.3d at 915. "This test is highly personal in nature and requires each judge in such situation to set aside emotion

MEMORANDUM OF DECISION - 19

and thoughtfully examine his ability to impartially 'administer justice without respect to persons.'" *Holland*, 519 F.3d at 915 (quoting 28 U.S.C. § 453).

Finally, on a motion to recuse under § 455, the court is not required to take factual allegations as true. *Seidel v. Durkin (In re Goodwin)*, 194 B.R. 214, 222-23 (9th Cir. BAP 1996).

This Court has previously examined and applied these principles and standards in addressing a motion to disqualify or for recusal. *See In re Jones*, 2002 WL 818275 (Bankr. D. Idaho 2002), *aff'd Hale v. United States Trustee (In re Jones)*, 2006 WL 694639 (D. Idaho 2006).

In the present Motion, Debtors contend that recusal is warranted for three basic reasons.[20] First, Debtors contend the Court's *ex parte* contact with attorney Catherine Dullea evidences bias. *See* Doc. No. 107 at 2 ("Reason # 1"). Second, Debtors contend that the judge is biased against them due to the judge's alleged "personal prejudice" toward Debtor David Allen's "personal paralegal and secretary." *Id.* at 3 ("Reason # 5"); *see also id.* at 4 ("Reason # 7"). Third, Debtors contend that the Court's rulings in this matter (or the alleged failures to issue written rulings) demonstrate bias and show that the Court has engaged in

---

[20]   The Motion list seven separate reasons, which fall into the three categories listed here. *See* Doc. No. 107, at 2-3. Debtors also filed an "Affidavit of Adjudicative Facts of David B. Allen in Support of Motion for Disqualification/Recusal . . . ." *See* Doc. No. 113; *see also* SunTrust Adv. Doc. No. 15. In this affidavit, Debtors contend that recusal is warranted for many of the same reasons set forth in the Motion. Those arguments are, therefore, also addressed below. The Court concludes that certain other statements made in the affidavit either do not support recusal or are irrelevant to the motion for recusal.

MEMORANDUM OF DECISION - 20

fraud.  *See* Doc. No. 107, at 2-3 (Reasons # 2, 3, 4, and 6).

### A.    The *ex parte* contact

Debtors' Motion is based, in large part, on this Court's December 23, 2008

*ex parte* contact with Ms. Dullea.  This contact, which clearly occurred and was

disclosed in the text of the December 23 order and at the outset of the January 13,

2009 hearing and in the January 16, 2009 oral ruling, does not require or support

recusal.

The fact that a judge has an *ex parte* communication does not, standing

alone, require recusal under 28 U.S.C. § 455.  *See Willenbring v. United States*,

306 F.2d 944, 946 (9th Cir. 1962).  In other words, a reasonable person, with

knowledge of all the facts, would not necessarily question a judge's impartiality

based solely on the existence of an *ex parte* communication.  Instead, the issue is

whether the judge received information that could, or did, affect the court's ruling.

*See United States v. Wolfson*, 634 F.2d 1217, 1221-22 (9th Cir. 1980)

(prosecutor's *ex parte* sentencing report required recusal).  Thus, the Code of

Conduct for United States Judges prohibits *ex parte* communications "on the

merits, or procedures affecting the merits, of a pending or impending proceeding."

*Code of Conduct for United States Judges*, Canon 3A(4), printed at 175 F.R.D.

363, 367 (1998).[21]

---

[21]  Canon 3A(4) provides, in relevant part:

(continued...)

MEMORANDUM OF DECISION - 21

Consistent with these standards, several courts have held that *ex parte* communications regarding scheduling or administrative matters do not require recusal.[22]  *See, e.g., In re Beard*, 811 F.2d 818, 829-30 (4th Cir. 1987) (discussed below); *In re Casco Bay Lines, Inc.*, 17 B.R. 946, 956 (1st Cir. BAP 1982) (*ex parte* contacts between bankruptcy judge and chapter 11 trustee do not require disqualification where such contacts involved questions on administrative aspects of cases and did not involve disputed issues); *In re Parr Meadows Racing Ass'n, Inc.*, 5 B.R. 564, 585 (Bankr. E.D.N.Y. 1980) (same).  *See generally* 9 Am. Jur. 2d *Bankruptcy* § 421 (discussing cases).

For example, in *In re Beard*, 811 F.2d 818, 829-30 (4th Cir. 1987), a district court judge had an *ex parte* meeting with debtor's counsel on the day a bankruptcy petition was filed.  At this meeting, debtor's counsel sought to have the district

---

[21] (...continued)
> A judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte communications on the merits, or procedures affecting the merits, of a pending or impending proceeding.

175 F.R.D. at 367.

[22]  Recent Ninth Circuit cases on point have been decided in unpublished dispositions. For example, in *Keller v. Los Osos Community Services District,* 39 Fed. Appx. 581, 584 (9th Cir. 2002), the court held that a federal district judge would not be disqualified because of alleged *ex parte* contacts with the defendant, where the contact was minimal and concerned an administrative matter.  Similarly, in *In re Adbox, Inc.*, 234 Fed. Appx. 420, 421 (9th Cir. 2007), ex parte contacts between a bankruptcy judge, his law clerk, and counsel for Chapter 7 trustee did not warrant recusal because the communications related to purely procedural matters and there was no evidence that they affected the judge's rulings.

MEMORANDUM OF DECISION - 22

court enter an administrative order that would keep the matter before the district court, rather than referring it to a bankruptcy judge. *Id.* The Fourth Circuit concluded that this order, which the district court entered, was nothing more than "a procedural order to govern the administration of a complex Chapter 11 proceeding." *Id.* at 830. As such, the district court's meeting and entry of the order did not warrant disqualification. *Id.*

Under the above authorities, recusal is not necessary. The *ex parte* contact at issue occurred because the Court wished to avoid, and believed the parties would wish to avoid, an emergency, Christmas-Eve hearing. As a result, when the Court contacted counsel, scheduling was the only topic discussed; the merits of the case or of the pending motion were not discussed. The gist of the contact was simple: would Dullea be available for an emergency hearing on the implied request for a temporary restraining order, or would she agree to a postponement of the foreclosure sale under Idaho law for approximately one month in order that a hearing could be held in January. There was no discussion about the merits of the requested injunction or other relief.[23]

The Court concludes that no reasonable person, with knowledge of all the

---

[23] The Court observes that the upshot of the *ex parte* communication was that the trustee's sale set for December 24, 2008, was postponed. This was the relief sought by Debtors, as best the Court could divine from those pleadings at the time and as verified by later events. Debtors thus received their relief without an emergency hearing (and also avoided the prospect of denial of the request for failure to comply with Rule requirements), and had the ability to advance their contentions with the better part of an additional month to prepare.

MEMORANDUM OF DECISION - 23

facts, would question the Court's impartiality. Recusal is not warranted based upon the *ex parte* contact with Ms. Dullea.

### B.    Questions regarding "Steven David of aver"

Recusal is also not warranted based upon the judge's alleged prejudice toward Mr. David, whom Debtor David Allen refers to as his "personal paralegal and secretary." *See*, *e.g.*, Doc. No. 107, at 3.

During the January 13 hearing in this matter, the Court questioned Debtors regarding what type of assistance Mr. David was providing to them.[24] The Court also questioned whether Mr. David's assistance might constitute the unauthorized practice of law. Debtors now complain that through such questioning, "Judge Meyers [*sic*] showed his interest in a non-party to the case to be higher than the actual legal issues properly brought before the court . . . ." Doc. No. 107, at 4.

The Court's comments and questions on this subject are a matter of record, and the Court has reviewed them in preparing this decision. As to Mr. David, the Court's comments to Debtors reflect no more than the concern that Debtors, in representing themselves, should rely on their own analysis of the law and facts, rather than relying on the input or advice of one who is not legally permitted to provide such assistance. *See* Idaho Code § 3-104 (practicing law without having

---

[24]   At that hearing, the discussion commenced with the Court's general inquiry of Debtors about what sort of legal assistance they might have received, given their use of terminology like "fraud in the factum." In response, Mr. Allen disclosed some help had been received from a "good researcher, and secretary, and paralegal" and identified Mr. David as that person.

MEMORANDUM OF DECISION - 24

been admitted to practice by the Idaho Supreme Court constitutes contempt);

Idaho Code § 3-401 (establishing that it is in the public interest to protect against

the unauthorized practice of law); Idaho Code § 3-420 (providing criminal penalty

for unauthorized practice of law).[25]

To the extent Debtors elect to rely on Mr. David to act as a process server

or a typist, the Court has no concern. To the extent his services are more

extensive, and approach or include those prohibited by the Idaho Code, the Court

has cautioned Debtors, because they are the ones put at risk.

Finally, on this particular subject, the legal theories and arguments

advanced by Debtors in this chapter 13 case and in the related adversary

proceedings have been reviewed and evaluated by the Court on their own merits,

or lack thereof, and that evaluation does not consider whether the source of those

theories is a result of Mr. David's input or is solely the fruit of Debtors' own legal

research and analysis.

In short, the Court's questions regarding the scope of Mr. David's

involvement in this case do not reflect bias or any other basis for recusal.

### C.    The Court's rulings in this matter

Similarly, the Court's rulings on substantive and procedural matters in this

---

[25]   The website of the Idaho State Bar does not show any licensing for an individual
named Steven David.  *See* www2.state.id.us/isb/mem/attorney_roster.asp (last visited Mar. 30,
2009)

MEMORANDUM OF DECISION - 25

case do not warrant recusal.  *See generally Liteky v. United States*, 510 U.S. 540,

541 (1994) ("Judicial rulings alone almost never constitute valid basis for a bias or

partiality recusal motion.").

### 1.    Fraud/illegality

Debtors advance several theories as to why the Court's rulings (or in some

instances, alleged failures to rule) require recusal.  Debtors' main contentions,

however, revolve around the idea that, by rejecting Debtors' contentions of "fraud

in the factum" or "fraud in the inducement" or "fraud upon the court" (etc.), the

Court has shown either a bias against them, or has become a participant in such

"fraud" (including, apparently, committing fraud upon itself).

Here, by way of background, Debtors generally refer to arguments they

raised after this Court lifted the automatic stay as to the Trapper Creek property

and the Shingle Mill Road residence.  *See* Doc. Nos. 65-67.  Broadly speaking, the

Debtors now contend that the loan documents underlying their purchase of these

properties are invalid.  *See, e.g.,* WSB Adv. Doc. No. 1 (adversary complaint);

SunTrust Adv. Doc. No. 1 (adversary complaint).[26]  Thus, according to Debtors,

allowing foreclosure sales of these properties is both illegal and constitutes a

fraud.  For example, in the recusal motion, Debtors contend that the Court should

---

[26]  The reasons for such invalidity include, but are not limited to, the arguments outlined previously about the effect of Debtors' provision of promissory notes to creditors.  As another example, Debtors argue that certain of the creditors' allegedly ineffective compliance with Idaho's statute on assumed business names renders their conduct illegal and vitiates any enforceable debt or security for debt.

MEMORANDUM OF DECISION - 26

have "either rescinded or declared void sua sponte" its prior order lifting the stay as to the Trapper Creek property and by not doing so "participated in the furtherance of the fraud upon the court to the detriment of [Debtors]. *See* Doc. No. 107, at 2.

The first problem with Debtors' contention that the Court has demonstrated bias by rejecting their arguments is the fact that many of these "fraud" arguments have never been ruled on. Debtors' motion for injunctive relief was instead denied on the grounds outlined above, particularly upon the principles of judicial estoppel and the conclusive, *res judicata* effect of confirmation of the chapter 13 plan. *See* Jan. 16, 2009, oral ruling; *see also* WSB Adv. Doc. No. 22. Because of these rulings, the Court did not need to, and did not, rule on the merits (or demerits) of these various theories.

The second problem is that Debtors confuse disagreement with fraud. If the Court or the other litigants in this action disagree with their theories, Debtors characterize them, by virtue of such disagreement, as having committed or supported fraud. However, as the authorities above indicate, in the context of a motion for disqualification, "judicial rulings alone almost never constitute [a] valid basis for a bias or partiality recusal motion . . . . [¶] Almost invariably, they are proper grounds for appeal, not for recusal." *Goodwin*, 194 B.R. at 224 (citing *Liteky*, 510 U.S. 540, 541, 555 (1994)). Rather, as stated in *Goodwin*, "even if [the judge] erred, that does not constitute bias. A judge may be wrong without being

MEMORANDUM OF DECISION - 27

prejudiced." *Id.* (quoting *Liteky*, 510 U.S. at 541).

In a variation on this theme, Debtors also argued at the March 18 hearing that certain comments made by the Court at the January 13 hearing reflected such fraud. According to Debtors, the Court is to have stated that it "often supported the enforcement of illegal contracts." Debtors misunderstood what was said.

The Court was addressing the conclusive effect of confirmation of a chapter 13 plan. In doing so, it commented on the decisional law in the Ninth Circuit, including the recent case of *Brawders v. County of Ventura (In re Brawders)*, 503 F.3d 856 (9th Cir. 2007). *Brawders* stands for the proposition that the principles of finality of confirmed plans insulate them from later attack, including provisions in such a plan that are arguably "illegal" or improper. *Id.* at 867.

For these reasons, Debtors' contentions that the Court, through its rulings, has engaged in fraud by rejecting Debtors' theories and/or by sanctioning illegal contracts lack merit. Similarly, these rulings do not evidence any bias toward the Debtors.

### 2.    Procedural and other rulings

Debtors next contend recusal is warranted based on the Court's refusal to consider several motions and objections at the January 13, 2009, hearing. As noted above, the Court refused to consider these motions and objections because they had not been noticed for hearing in conformity with the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 28

Debtors contend, however, that they were authorized to file such motions and notice them for a January 13 hearing based on this Court's December 23 order relating to Debtors' request for injunctive relief relating to the Trapper Creek property. *See* WSB Adv. Doc. No. 13. As noted above, the Court avoided a Christmas-Eve hearing by scheduling a January 13, 2009 hearing. *Id.* The order provided the following briefing schedule and service instructions:

> IT IS FURTHER ORDERED that Debtors shall serve copies of all December 23 Pleadings, and any other pleadings or papers they may file related to the December 23 Pleadings or the January 13 hearing, via facsimile (fax) transmission on attorneys Catherine L. Dullea and John A. Finney. *Any such additional pleadings and papers shall be filed by Plaintiffs no later than the end of December, 2008.* Any responsive pleadings or papers filed by Defendants shall be filed no later than 5:00 p.m. on January 5, 2009.

*Id.* at 2-3 (emphasis added). Focusing on the italicized language, Debtors contend that the Court authorized their various motions. They evidently feel that the Court's refusal to hear these matters on January 13 (due to improper notice) is inconsistent with the December 23 order and, thus, reflects bias.

The referenced instruction, however, was misconstrued or misunderstood by Debtors. That requirement of filing pleadings was directed to Adv. No. 08-07014-TLM. That is reflected, among other things, by the use of the term "Plaintiffs" in referring to Debtors. The obvious context was that, in connection with the temporary restraining order and the upcoming hearing in that adversary proceeding, the Plaintiffs would have to file any additional documents and

MEMORANDUM OF DECISION - 29

pleadings by December 31.

Even if the order's instructions are ambiguous enough that *pro se* litigants might believe other matters could be noticed for hearing in either the chapter 13 case or the adversary proceeding, nothing in the Court's order suggested that the requirements of the Rules, which govern practice and procedure and, among other things, exist to ensure due process, were negated.  The Court entered no order shortening the time required for notice.  *Cf.* Fed. R. Bankr. P. 9006(c).  If Debtors wanted to put something on the January 13 calendar through a December 31 motion or objection, they were subject to having that matter deferred if the required notice period was longer than the available 12 days.  The motions to modify and the objections to proofs of claim required lengthier notice.

In sum, neither the Court's scheduling orders nor its refusal to hear improperly noticed matters, warrant recusal.

### 3.    Lack of written orders

Finally, contrary to Debtors' contentions, this Court's alleged failure to enter "written orders" on the several motions and objections Debtors attempted to have heard on January 13 has not denied Debtors an effective right to appeal.   Nor does this alleged failure reflect improper motive, prejudice or bias.  *See* Doc. No. 107 at 3 (Reasons # 3, 6).  There are two basic problems with Debtors' arguments on this point.

First, as noted above, the motions and objections were not finally resolved

MEMORANDUM OF DECISION - 30

on January 13.[27]  The Court indicated that they had not been filed, served and noticed for hearing in compliance with the Rules, and they could later be heard if and when Debtors properly complied with those Rules.

Second, Debtors' appeal rights run from the entry of a dispositive order. *See* Fed. R. Bankr. P. 8001(a), 8002(a); 28 U.S.C. § 158(a).  If and when the matters are properly noticed and heard, and when a ruling is made, there would be a need for a written order and a right to appeal would exist.  Debtors have not lost that right by reason of an allegedly missing written order.  Debtors' contentions on this point thus lack merit.

## CONCLUSION

In conclusion, the Court has carefully and deliberately evaluated Debtors' contentions of bias.  These contentions are inadequate.  A reasonable, objective person would not harbor any questions regarding the Court's capacity to be fair and even-handed, and to rule on the matters brought by Debtors or others in this litigation solely based on the facts and the law.

Debtors, of course, are not such "objective persons" nor are they expected to be.  They appear to believe sincerely in the various theories they have advanced.  But their view is a subjective one.  They equate rejection of their

---

[27]  The only matter that was ruled upon was that of the "Notice of Constitutional challenge" of Debtors.  That notice was denied, but without prejudice and subject to renewal.  *See* Doc No. 101.

MEMORANDUM OF DECISION - 31

theories (or, more accurately, with the rulings that estop them from now advancing those theories) as more than simply disagreement but somehow as evidence of bias, prejudice or improper motive.

Not only is the mere fact of adverse ruling insufficient under applicable authorities to constitute grounds for recusal, the Court has reviewed each of its rulings and can state without equivocation that all were and are based on an evaluation of the record and the law, and have no genesis in any personal feelings about Debtors or any other improper factor.

The Court bears no animus, ill will or bias toward Debtors, and has no motive or agenda other than to correctly apply the law to the facts of the case. That the Court does not share Debtors' view of the law or the facts, or of the application of the law to those facts, is not evidence of bias.  Nor, under the authorities, is it grounds for recusal.  In point of fact, the Court has an obligation not to be hypersensitive to the suggestion of bias, and not to recuse without adequate basis.[28]

The Court has given due and serious consideration to its obligation and

---

[28]  *See In re Melendez*, 224 B.R. 525, 277 (Bankr. D. Mass. 1988) ("While the judge must be mindful of the objective test under § 455(a), she or he must also consider the policy that '[A] judge . . .  should not recuse himself on an unsupported, irrational, or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges.") (quoting *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981)).  *See also Holland*, 519 F.3d at 912 ("in the absence of a legitimate reason to recuse himself, 'a judge should participate in cases assigned.'") (quoting *Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985)).

MEMORANDUM OF DECISION - 32

duty to sit.  Where, as here, there is no credible objective basis for concluding that bias or partiality exists, and the Court through a self-executing evaluation is convinced the matter has been and can be fully and impartially heard, it would be improper to recuse.

Upon the foregoing, the Motion for Disqualification is determined to be without merit.  It will be denied by separate order.

DATED:  March 31, 2009

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 33